IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD CANFIELD,<br><br>Plaintiff,<br><br>v.<br><br>NARINDER SAUKHLA,<br><br>Defendant. | No. 2:18-CV-1092-KJM-DMC-P<br><br><br>FINDINGS AND RECOMMENDATIONS |

Plaintiff, a prisoner proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983. Pending before the court is Defendant's unopposed Motion for Summary Judgment, ECF No. 49.

The Federal Rules of Civil Procedure provide for summary judgment or summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The standard for summary judgment and summary adjudication is the same. See Fed. R. Civ. P. 56(a), 56(c); see also Mora v. ChemTronics, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. See

///

///

1

Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id., at 323 (quoting former Fed. R. Civ. P. 56(c)); see also Fed. R. Civ. P. 56(c)(1).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).  To demonstrate that an issue is genuine, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).  It is sufficient that "the claimed factual dispute be shown to require a trier of fact to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed, see Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the

2

1    court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587.

2    Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

3    produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen

4    Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

5    1987). Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for the

6    judge, not whether there is literally no evidence, but whether there is any upon which a jury could

7    properly proceed to find a verdict for the party producing it, upon whom the onus of proof is

8    imposed." Anderson, 477 U.S. at 251.

## I. PLAINTIFF'S ALLEGATIONS

This action proceeds on Plaintiff's third amended complaint. See ECF No. 28. Plaintiff alleges deliberate indifference to his medical needs, in violation of his Eighth Amendment rights. The sole remaining defendant is Dr. Narinder Saukhla, a physician who was Plaintiff's primary care physician while he was housed at the California Medical Facility (CMF) in Vacaville, California. See id. at 2, 6. Plaintiff alleges that Defendant's delay of treatment, misdiagnosis, and deliberate indifference to his medical needs resulted in amputation of his right lower leg. See id. at 2-3. According to Plaintiff, he told Defendant about lower extremity pain up to "8 out of 10" and swelling, and that Defendant did not act as required. Id. at 6. Plaintiff states that, if Defendant had taken timely action, his leg would not have required amputation. See id. at 6-7. Plaintiff states that other less invasive alternative treatments could have been used, including antibiotics, venous angioplasty, vascular grafting, discontinuation of steroid therapy, or change of diet. See id. at 7-8.

## II. DEFENDANT'S EVIDENCE

Defendant's unopposed motion is supported by the sworn declarations of Dr. Narinder Saukhla, Dr. Bennett Feinberg, and attorney Cheryl Hsu. See ECF Nos. 49-3, 49-4, 49-5. Defendant also relies on the following exhibits: Exhibit A, Plaintiff's medical records, see ECF No. 49-4, pgs. 11-111; and Exhibit B, resume of Dr. Bennett Feinberg, see ECF No. 49-4,

1  pg. 112. Citing this evidence, Defendant offers a Statement of Undisputed Facts, see ECF No.
2  49-1, in which Defendant contends the following facts are not in dispute:

3  Dr. Saukhla was, at all times relevant to the complaint, a licensed physician
4  employed by the California Department of Corrections and Rehabilitation (CDCR) at CMF. See
5  ECF No. 49-1, pg. 2. Plaintiff suffers from myriad of ailments, including type-two diabetes,
6  Crohn's disease, asthma, cardiomyopathy, seizures, and gastroesophageal reflux disease. See id.
7  at 2-3. Plaintiff also sustained severe foot and ankle injuries from jumping off a three-story
8  building at some point prior to his incarceration. See id. at 3. These injuries resulted in a total of
9  fourteen surgeries on Plaintiff's right ankle including a failed arthrodesis and a retained screw in
10 Plaintiff's left ankle. See id.

11 Plaintiff's relevant recorded medical history concerning his ankle begins on
12 September 30, 2014, at an exam by Dr. Dowbak. See id. Dr. Dowbak opined that Plaintiff's
13 health issues and medications might preclude the ability to perform successful elective orthopedic
14 surgery. See id. Dr. Dowbak again saw Plaintiff on December 11, 2014. See id. He could not
15 find a pulse in either of Plaintiff's ankles and opined that Plaintiff should be seen again in six to
16 eight weeks to determine if Plaintiff should be cleared for surgery. See od. At this appointment
17 Plaintiff requested amputation of his right leg and arthrodesis of his left ankle. See id.

18 On January 6, 2015, Plaintiff experienced a hypoglycemic episode. See id. at 4.
19 At a follow-up after this episode, Plaintiff saw Dr. Awatani. See id. Dr. Awatani opined that
20 Plaintiff was at high risk for any surgery. See id. That same month, Plaintiff was transferred to
21 CMF in Vacaville. Id. He received medical care and follow-up appointments on a two-week
22 basis. Id.

23 In March of 2015, Plaintiff was evaluated for cardiac risk during surgery. See id.
24 at 5. On June 3, 2015, the Nurse Practitioner evaluating Plaintiff found that he was at low risk of
25 coronary ischemia during any orthopedic surgery. See id. In June, Plaintiff started experiencing
26 foot pains after playing baseball at CMF and was referred to a specialist, again Dr. Dowbak. See
27 id. Dr. Dowbak saw Plaintiff on July 6, 2015, and noted Plaintiff's cardiac clearance for surgery,
28 but opined that Plaintiff should have a vascular assessment before any proposed surgeries. See id.

1         In August of 2015, Plaintiff received a consultation for vascular disease prior to
2  potential surgery. See id. at 6. Dr. Dowbak followed up on the results of this consultation on
3  October 8, 2015. See id. He opined that Plaintiff had too many comorbidities for surgery but
4  referred Plaintiff to the UC Davis Medical Center for a vascular surgery consultation for possible
5  stenting of Plaintiff's lower extremity bloods vessels. See id. at 6-7. Dr. Dawson at the UC
6  Davis Medical Center recommended further evaluation. See id.
7         In January of 2016, Defendant became Plaintiff's primary care provider, reviewed
8  Plaintiff's condition and medications up to that point, and began seeing Plaintiff approximately
9  every two weeks. See id. at 7. On March 7, 2016, Dr. Dawson again evaluated Plaintiff's
10 vascular condition, determined that no vascular intervention was needed, and concluded that
11 Plaintiff had adequate blood flow to allow for healing from orthopedic surgeries. See id. at 7-8.
12 Plaintiff's regular visits with Defendant mostly focused on Plaintiff's Crohn's disease and other
13 unrelated issues. See id. at 8. Over five visits between March 18, 2016, and May 17, 2016,
14 Plaintiff did not raise any concerns about his ankle. See id.
15         In May of 2016, Plaintiff told Defendant that his ankle was turning black. See id.
16 Defendant had previously prescribed a walker for Plaintiff and at this visit upgraded the
17 prescription to a wheelchair. See id. On May 25, 2016, medical records indicate that Plaintiff
18 first mentions his ankle pain to Defendant. See id. Defendant referred Plaintiff to a specialist.
19 See id. On May 31, Plaintiff received x-rays on his right ankle. See id.
20         On June 16, 2016, Plaintiff saw Dr. Andrew Sawicki, a podiatrist. See id. Dr.
21 Sawicki noted ankle instability and recommended a follow-up with a Dr. Highsmith. See id.
22 Defendant submitted the referral to Dr. Highsmith the same day. See id. On June 30, 2016,
23 Plaintiff again saw Defendant, and this time requested a second opinion regarding his left ankle
24 (not his right, which was ultimately amputated). See id. On July 13, Plaintiff submitted a request
25 for health care stating that his right ankle was in pain, and he requested surgery. See id. On July
26 22, Plaintiff saw Dr. Highsmith, who recommended a brace to control symptoms and a follow-up
27 at UC San Francisco or UC Davis. See id. at 8-9.
28 / / /

5

1    On August 3, 2016, Plaintiff saw Dr. Alicia Knee, at the Foot and Ankle Clinic in
San Francisco. See id. at 9. Dr. Knee opined that surgery presented a high risk of infection and surgical non-union of the bones. See id. On August 5, Plaintiff followed up with Dr. Sawicki, but the subject of that consultation is not clear. See id. On August 7, 2016, Plaintiff went to the Treatment and Triage Area of the prison, complaining of right ankle pain. See id. He was triaged, told not to place weight on his ankle, and instructed to see his care provider the next day. See id. Plaintiff saw Defendant the next day. See id. At that time, Plaintiff reported that he had been experiencing greater-than-average ankle pain for three days and that he had a low-grade fever. See id. Defendant ordered labs and sent Plaintiff back to the triage area to be evaluated for transfer to San Joaquin General Hospital (SJGH) for further treatment. See id.

Plaintiff was admitted to SJGH where it was determined that Plaintiff's right foot required amputation due to onset of sepsis. See id. at 10. The amputation was performed on August 12, 2016. See id.

### III. DISCUSSION

Defendant argues that the undisputed facts entitle him to judgement as a matter of law because the evidence shows that Defendant was not deliberately indifferent to Plaintiff's medical needs. For the reasons discussed below, the Court agrees.

The treatment a prisoner receives in prison and the conditions under which the prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual punishment. See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan, 511 U.S. 825, 832 (1994). The Eighth Amendment ". . . embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102 (1976). Conditions of confinement may, however, be harsh and restrictive. See Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Nonetheless, prison officials must provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986). A prison official violates the Eighth Amendment only when two requirements are met: (1) objectively, the official's act or omission must be so serious such

1    that it results in the denial of the minimal civilized measure of life's necessities; and (2)
2    subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of
3    inflicting harm. See Farmer, 511 U.S. at 834. Thus, to violate the Eighth Amendment, a prison
4    official must have a "sufficiently culpable mind." See id.

5    Deliberate indifference to a prisoner's serious illness or injury, or risks of serious
6    injury or illness, gives rise to a claim under the Eighth Amendment. See Estelle, 429 U.S. at 105;
7    see also Farmer, 511 U.S. at 837. This applies to physical as well as dental and mental health
8    needs. See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982), abrogated on other grounds by
9    Sandin v. Conner, 515 U.S. 472 (1995). An injury or illness is sufficiently serious if the failure to
10   treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and
11   wanton infliction of pain." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled
12   on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc); see
13   also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994). Factors indicating seriousness
14   are: (1) whether a reasonable doctor would think that the condition is worthy of comment; (2)
15   whether the condition significantly impacts the prisoner's daily activities; and (3) whether the
16   condition is chronic and accompanied by substantial pain. See Lopez v. Smith, 203 F.3d 1122,
17   1131-32 (9th Cir. 2000) (en banc).

18   The requirement of deliberate indifference is less stringent in medical needs cases
19   than in other Eighth Amendment contexts because the responsibility to provide inmates with
20   medical care does not generally conflict with competing penological concerns. See McGuckin,
21   974 F.2d at 1060. Thus, deference need not be given to the judgment of prison officials as to
22   decisions concerning medical needs. See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir.
23   1989). The complete denial of medical attention may constitute deliberate indifference. See
24   Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986). Delay in providing medical
25   treatment, or interference with medical treatment, may also constitute deliberate indifference. See
26   Lopez, 203 F.3d at 1131. Where delay is alleged, however, the prisoner must also demonstrate
27   that the delay led to further injury. See McGuckin, 974 F.2d at 1060.
28   ///

Negligence in diagnosing or treating a medical condition does not, however, give rise to a claim under the Eighth Amendment. See Estelle, 429 U.S. at 106. Moreover, a difference of opinion between the prisoner and medical providers concerning the appropriate course of treatment does not give rise to an Eighth Amendment claim. See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

The essence of Plaintiff's complaint is that Defendant failed to treat Plaintiff's ankle with less invasive procedures earlier during Plaintiff's illness. According to Plaintiff, this necessitated the amputation of his right foot below the knee. The undisputed facts show precisely the opposite. In particular, Plaintiff's medical records amply illustrate that Plaintiff was receiving regular medical attention and evaluation. See ECF No. 49-4. This regular treatment included numerous consultations to evaluate the likelihood of success or complications of orthopedic surgery to repair the damage to Plaintiff's right ankle. The medical records show no signs of delay or indifference.

At best, Plaintiff's allegations support a claim that Defendant failed to follow a proper course of treatment. Such a claim does not typically rise to the level of an Eighth Amendment violation unless "the course of treatment the doctors chose was medically unacceptable under the circumstances." Jackson, 90 F.3d at 332 (citing Williams v. Vincent, 508 F.2d 541, 543-544 (2d Cir. 1974)). To prevail, Plaintiff must show that Defendant "chose this course in conscious disregard of an excessive risk to plaintiff's health." Id. (citing Farmer, 511 U.S. at 825).

Here, the undisputed evidence shows that Plaintiff cannot establish a medically unacceptable course of treatment. In the opinion of Defendant's medical expert, Dr. Feinberg: "[Defendant] did not breach the proper standard of care in his care of Plaintiff." ECF No. 49-4, pg. 8. Moreover, the medical record demonstrates that Defendant followed an exceptionally detailed and thorough evaluation process. For example, Defendant referred Plaintiff to numerous specialists to determine whether orthopedic surgery was a viable option for Plaintiff as recently as the month prior to Plaintiff's amputation. See id. at 49-4, 8-9. Defendant also appropriately relied on the opinions of those experts in waiting for further testing to perform surgery. See id. at

9. And when Plaintiff's situation became acute, Defendant immediately assessed Plaintiff's ankle and ordered Plaintiff's transport to the hospital for emergency treatment.

The only evidence that could suggest a medically unacceptable course of treatment is Plaintiff's assertion at his deposition that Defendant took a more aggressive, non-surgical approach to similar issues that subsequently developed on Plaintiff's remaining foot, preventing the need for amputation. See Canfield Dep. 88:25-89-12. There are, however, numerous reasons why different treatments may have been appropriate for an ailment to Plaintiff's other foot. That Defendant responded differently to a new medical condition does not create a genuine dispute of material fact about whether Defendant pursued an appropriate course of action in the instant case. Finally, regarding Plaintiff's deposition testimony in this regard, the Court observes that Plaintiff is not a medical expert qualified to render opinion evidence. Plaintiff's deposition testimony regarding the acceptability of the course of treatment he received is simply not evidence which would be admissible to rebut the medical expert evidence provided by Defendant.

Plaintiff further testified at his deposition that he thought it was wrong that he was not prescribed antibiotics. See id. at 45:1-5. Again, that he did not receive antibiotics does not create a genuine dispute of material fact regarding whether Plaintiff's course of treatment was medically unacceptable, particularly where there is admissible medical expert evidence which shows otherwise.

On the evidence provided by Defendant, which Plaintiff has not opposed, the Court finds that there is no genuine dispute of material fact on the merits of Plaintiff's Eighth Amendment claim. Defendant is entitled to judgment as a matter of law because Plaintiff cannot establish that Defendant was deliberately indifferent.

///
///
///
///
///
///

### IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that Defendant's unopposed motion for summary judgement, ECF No. 49, be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections.  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

**Dated:  July 29, 2022**

_____
DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE